# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | David H. Coar | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 02 C 7024 | **DATE** | 6/19/2003 |
| **CASE TITLE** | Lisle Corp. vs. A.J. Manufacturing Co. | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

Claim Construction

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____ . Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
    ☐ FRCP4(m)   ☐ Local Rule 41.1   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).
(10) ■ [Other docket entry]   The claims of U.S. Patent number 5,287,776 patent are construed as set forth in the attached memorandum opinion and order.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | Document Number |
|---|---|---|---|
| | No notices required, advised in open court. | | |
| | No notices required. | number of notices | |
| | Notices mailed by judge's staff. | JUN 2 4 2003 | |
| | Notified counsel by telephone. | date docketed | |
| ✓ | Docketing to mail notices. | | |
| | Mail AO 450 form. | docketing deputy initials | 32 |
| | Copy to judge/magistrate judge. | | |
| jar/lc | courtroom deputy's initials | date mailed notice | |
| | | Date/time received in central Clerk's Office | mailing deputy initials |



JUN 2 4 2003

JUN 2 4 2003

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| LISLE CORPORATION, an Iowa corporation </br></br>Plaintiff,</br></br>v.</br></br>A.J. MANUFACTURING COMPANY, an Illinois Corporation</br></br>Defendant. | No. 02 C 7024 </br></br>HONORABLE DAVID H. COAR |

## MEMORANDUM OPINION AND ORDER

Lisle Corporation ("Lisle") filed suit against A.J. Manufacturing Company ("A.J.") alleging that it infringed U.S. Patent No. 5,287,776 (the "'776 patent") by manufacturing and selling a specialized automotive inner tie rod tool. On February 21, 2003, this Court ordered the parties to submit simultaneous briefs setting forth their respective constructions of the scope of the '776 patent. Having considered the submissions of the parties, this Court will set forth below its construction of the claim in the '776 patent.

### I. Canons of Claim Construction

Construction of patent claims is a question of law for the court. See Markman v. Westview Instruments, Inc., 52 F.3d 967, 979-81 (Fed. Cir. 1995). Claim construction is "the process of giving proper meaning to the claim language." Abtox, Inc. v. Exitron Corp., 122 F.3d 1019, 1023 (Fed. Cir. 1997). This process will "define[] the scope of the protected invention." Id.

1

32

The principal source for constructing the claim is the language of the patent claim itself. Teleflex, Inc. v. Ficosa North America Corp., 299 F.3d 1313, 1324 (Fed. Cir. 2002). In the absence of an express intent to impart a novel meaning to claim terms, there is a "heavy presumption" that a claim term carries its ordinary and customary meaning to a person of ordinary skill in the relevant art. Teleflex, 299 F.3d at 1325.

Beyond the ordinary meaning of the claim language, the Court "must . . . examine[] [the intrinsic record] in every case to determine whether the presumption of ordinary and customary meaning is rebutted." Tex. Digital Sys., Inc. v. Telegenix, Inc., 308 F.3d 1193, 1209 (Fed. Cir. 2002). The intrinsic record includes the claim, the specification (including any drawings or written descriptions), and the prosecution history. See Markman, 52 F.3d at 979 ("To ascertain the meaning of claims, we consider three sources: The claims, the specification, and the prosecution history.") (quoting Unique Concepts, Inc. v. Brown, 939 F.2d 1558, 1561 (Fed. Cir. 1991)). The intrinsic evidence can provide much needed "context and clarification about the meaning of claim terms." Teleflex, 299 F.3d at 1325.

Of all the intrinsic evidence, the Federal Circuit has indicated that the specification is the "single best guide to the meaning of a disputed term." Vitronics, Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1582 (Fed. Cir. 1996). "Usually, it is dispositive." Id. The specification may be consulted to resolve ambiguity if the ordinary and customary meanings of the words used in the claims are not sufficiently clear to allow the scope of the claim to be determined form the words alone. See Teleflex, 299 F.3d at 1325. The specification can also reveal limitations to the scope of the claim. Id. ("[o]ne purpose for examining the specification is to determine if the patentee has limited the scope of the claims."). The drawings and written description are examined "to

determine whether the patentee has disclaimed subject matter or has otherwise limited the scope of the claims." Rexnord Corp. v. Laitram Corp., 274 F.3d 1336, 1343 (Fed. Cir. 2001).

Any limitations present in the specification, however, must be carefully circumscribed and not imported wholesale into the patent claim. See Teleflex, Inc., 299 F.3d at 1326. Where a specification contains only one embodiment, for example, there is no rule that the claim is limited to the embodiment in the specification. Id. ("[the party] argues that where only one embodiment is disclosed in the specification, claim terms are limited to the embodiment disclosed . . . . [O]ur precedent establishes no such rule."). On the other hand, "where the specification makes clear that the invention does not include a particular feature, that feature is deemed to be outside the reach of the claims of the patent, even though the language of the claims [in isolation] . . . might be considered broad enough to encompass the feature in question." Scimed Life Sys. v. Advanced Cardiovascular Sys., 242 F.3d 1337, 1341 (Fed. Cir. 2001).

To sum up, the specification will always provide context for the language of the claim, and it will occasionally limit the claim. For the specification to provide a clear limit, though, the limiting aspect must "represent[] a clear disavowal of claim scope." Teleflex, Inc., 299 F.3d at 1325.

The court should also examine the prosecution history to determine whether the patentee has ascribed a special meaning to the term that is inconsistent with the term's ordinary meaning. Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1582 (Fed. Cir. 1996). Furthermore, any meaning that was disclaimed during the prosecution of the patent as revealed by the prosecution history is excluded. Vitronics, 90 F.3d at 1583.

3

If the meaning of the disputed terms are still ambiguous after consideration of intrinsic evidence, courts can consider extrinsic evidence. Kopykake Enters., Inc. v. Lucks Co., 264 F.3d 1377, 1381 (Fed Cir. 2001). Reliance on extrinsic evidence is strongly disfavored in claim construction, though, as it would undermine the public notice function of the patent claim. The Only two types of extrinsic evidence have been permitted with any frequency: (1) dictionaries to determine the ordinary meaning of claim language, see Advanced Cardiovascular Sys., Inc. v. Medtronic, Inc., 265 F.3d 1294 (Fed. Cir. 2001) (may resort to dictionary when intrinsic evidence insufficient); Bell Atl. Network Servs., Inc. v. Covad Communications Group, Inc., 262 F.3d 1258, 1267 (Fed. Cir. 2001) ("dictionaries and technical treatises hold a 'special place' and may sometimes be considered along with the intrinsic evidence"); (2) testimonial evidence regarding the understanding of the ordinary skilled artisan, see AFG Indus., Inc. v. Cardinal IG Co., 129 F.3d 1239, 1249 (Fed. Cir. 2001) ("failure to take into account the testimony of persons of ordinary skill in the art may constitute reversible error"); Pitney Bowes, Inc. v. Hewlett-Packard Co., 182 F.3d 1298, 1309 ("it is entirely appropriate, perhaps even preferable, for a court to consult trustworthy extrinsic evidence to ensure that the claim construction . . . is not inconsistent with clearly expressed, plainly apposite, and widely held understandings in the pertinent technical field.").

## II. Construction of the Claim in the '776 Patent

The '776 patent was issued on February 22, 1994 and entitled "Inner Tie Rod Tool." The '776 Patent has six claims; the first is an independent claim with five dependent claims. The parties dispute four claim terms/phrases within the '776 patent. The claims of the '776 patent are set forth below, with the disputed language underlined and in boldface type:

4

1. A tool for removal of inner tie rods comprising in combination:
    (a) a nut engaging, C-shaped wrench disc having spaced arms for engaging a nut, and outwardly projecting tabs for cooperation with a **retainer**; and

    (b) a hollow tube for placement over a tie rod, said tube having a **retainer** at one end and at least two slots for **cooperatively engaging** the tabs of the wrench disc and means for cooperation with tube rotation means at the opposite end, **said retainer being detachably cooperative with the tabs to rotate the disc and a tie rod engaged therewith**.

2. The tool of claim 1 wherein the means for cooperation with tube rotation means comprise a socket.

3. The tool of claim 1 wherein the disc includes first and second tabs radially projecting outwardly in opposite directions from the center of the disc.

4. The tool of claim 1 wherein the **retainer includes slots** therein for receipt of the tabs.

5. The tool of claim 1 including a plurality of discs each cooperative with the retainer, each disc being separately cooperative with a different size nut.

6. The tool of claim 1 wherein the retainer includes a rotatably [sic] sleeve, the slots of the retainer being disposed on said rotatable sleeve and being L-shaped for rotation of the sleeve for locking receipt of a tab.

(Pl. Ex. A at col. 4, lines 16-42).[1]

The parties dispute four separate terms or phrases in the claim: (1) "retainer"; (2) "cooperatively engaging"; (3) "said retainer being detachably cooperative with the tabs to rotate the disc and a tie rod engaged therewith"; and (4) "retainer includes slots". The Court will address the parties' arguments and conclusively construct each contested term below.

---

[1] Plaintiff submitted six exhibits, numbered A through F, along with its brief on claim construction. The Court refers to these exhibits as Plaintiff's Exhibit A–F. For Exhibit A, the '776 patent, the Court will cite to column and line numbers. For Exhibits B through E, the Court will cite using page numbers. For Exhibit F, which is rather lengthy, the Court will cite to the Bates number.

5

### 1. Construction of "Retainer"

The parties dispute the meaning of the term "retainer". Plaintiff Lisle seeks to construe "retainer" to mean "any of various devices used for holding something." Defendant A.J.'s proposed construction is much narrower: "a collar or ring rotatably affixed over the surface of the hollow tube for locking the tabs of the c-shaped wrench disc into position." (Pl. Ex. D) Lisle's proposed construction comes from Webster's Ninth New Collegiate Dictionary; A.J.'s proposed construction is derived from the drawings and references in the patent, specification, and prosecution history. Plaintiff's proposed construction benefits from a "heavy presumption" in that claim terms carry their ordinary meaning to a person of ordinary skill in the relevant art. Teleflex, 299 F.3d at 1325.

The critical distinction between the two parties' positions is whether the retainer described in the claim must be separate from the tube. Under Lisle's construction, the claim would permit the retainer to be either a separate piece or a permanent fixture. A.J.'s construction of the claim would limit the patent to devices that contain a separate piece as a retainer.

The claim itself does not specify whether the retainer must be separate, although the preferred embodiment of the claim does demonstrate a separate retainer. The Federal Circuit consistently warns that "claim terms are [not] limited to the embodiment disclosed." Teleflex, 299 F.3d at 1326. In some cases, though, "the preferred embodiment is . . . the invention itself." See Modine Mfg. Co. v. United States Int'l Trade Comm'n, 75 F.3d 1545, 1551 (Fed. Cir. 1996). For a variety of reasons, this is not such a case.

In the '776 patent, the preferred embodiment contains a separate retainer that is variably referred to as a "retainer ring", "retainer collar", or just "ring" throughout the description of the

6

invention. From a review of the specification and the prosecution history, though, it is apparent that the invention covers both a separate retaining ring and a permanent retainer built into the tool.

From the manifest language of the claim, it is clear that the invention consists of at least two component parts: (1) a C-shaped insert with outwardly projecting tabs; and (2) a hollow tube with a retainer for engaging the C-shaped insert at one end and "means for cooperation with tube rotation means at the opposite end." (Pl. Ex. A at col. 4, lines 16–28). In prosecution of the patent, the application was rejected twice on the grounds of obviousness in light of two French patents. One of these, the Gross patent, combined inserts with both hexagonal and tubular wrenches to make the wrench have broader applicability. The other, the Koralek patent, revealed a wrench with a single tab to hold the insert in place. To overcome these patents, Lisle represented to the Patent and Trademark Office (PTO) that it was the retaining structure, not merely the insert or the tabs, that differentiated the '776 patent invention from the prior art.

Defendant A.J. asserts that Lisle's representation that "one cannot simply combine a C-shaped insert with a tubular wrench" (Pl. Ex. F at LIS 000870) must mean that their invention requires a retainer to be separate from the C-shaped insert and the tubular wrench. A.J. removes this language from the context of the prosecution history, however. In the paragraph containing the above quoted language, Lisle continues "It takes <u>structure</u> to make it work . . . The teaching of Gross do[es] not disclose or suggest structure that enables use of a C-shaped inserts with a tubular wrench." (Pl. Ex. F at LIS 000870). From this language, it is clearly not the separateness of the retaining structure that differentiates the '776 patent from the prior art. Rather it is a retaining structure that accommodates a C-shaped insert with a tubular wrench that differentiates

7

it from the prior art. This is the clearest statement in the prosecution history regarding the differentiation of the '776 patent from the prior art that the PTO believed was most relevant to the present claim, and it does not specify the separateness of the retaining structure.

Although A.J. insists it is not trying to limit the '776 patent to the preferred embodiment, that would be the precise result of adopting their proposed construction. A.J.'s proposed construction of the term "retainer" is much too narrow. A.J. asserts that the consistent reference to "retainer collar" or "retainer ring" must mean that the retainer is a collar or ring separate from the hollow tube. There is no reason to so limit the claim language. A collar or a ring could either be separate or permanently affixed. Indeed, men's shirt collars were once always separate and now they are nearly always affixed. A.J.'s proposed construction would needlessly cabin the '776 patent into a three separate piece invention consisting of a tube, a C-shaped disc, and a retainer.

The Court finds that Lisle's proposed construction of the term "retainer" is consistent with the language, specification, and prosecution history of the '776 patent. The term "retainer" in the '776 patent is construed to mean: any of various devices used for holding something.

### 2. Construction of "Cooperatively Engaging"

The parties dispute the meaning of the phrase "cooperatively engaging". Plaintiff Lisle seeks to construe the phrase to mean "work together to interlock." (Pl. Br. at 11). Defendant A.J.'s proposed construction of the phrase is "the retainer and the slots of the hollow tube work at the same time so that the tabs of the c-shaped wrench disc are locked into position." (Def. Br. at 16). However, the parties agree that "the plain meaning of cooperatively is to work together and that of engage is to interlock with." (Def. Br. at 16).

8

Before embarking on construction of this phrase, the Court will recite the phrase in its full context in claim 1: "said tube having a retainer at one end and at least two slots for **cooperatively engaging** the tabs of the wrench disc". (Pl. Ex. A at col. 4, line 21–24). Lisle asserts that the disputed phrase only relates to the slots of the tube and the tabs of the disc. (Pl. Br. at 11–12). A.J.'s proposed construction, on the other hand, would relate the disputed term to the slots of the tube, the tabs of the disc, and the retainer.

Looking solely at the plain language of this segment of the claim, it seems to be a victim of gramatically imprecise drafting. Reading the claim from left to right, "at one end" could refer only to "having a retainer" and "cooperatively engaging" could refer only to the slots and the tabs. It is clear from the specifications and the drawings, though, that the phrase "at one end" modifies both "a retainer" and "at least two slots". An alternative, and more precise, way of phrasing the same portion of the claim then would be: "said tube having at one end a retainer and at least two slots for cooperatively engaging the tabs of the wrench disc." This must be what the inventor intended to convey, as the invention can only accomplish its intended purpose if the tabs, the slots, and the retainer work together. This intrepretation is consistent with part (a) of claim 1, which indicates the C-shaped wrench has "outwardly projecting tabs for cooperation with a retainer". (Pl. Ex. A at col. 4, line 19–20). The Court finds that the disputed phrase "cooperatively engaging" refers to the tabs, the slots on the tube, and the retainer to operate together.

Beyond that, the Defendant has not presented any compelling arguments that the terms themselves should mean anything beyond their plain meaning. The plain meaning of the term, again, is "work together to interlock." A.J. seeks a further construction that working together

9

requires the parts to function simultaneously. There is a danger in relying upon dictionary definitions of words that are themselves definitions of other words. As the distance from the original term ("cooperatively") increases, the precision with which any dictionary can produce the plain or ordinary meaning of the term decreases. A.J. rightly points out that "together" ordinarily connotes simultaneity, but the Court believes that "work together" is a sufficiently precise definition of "cooperatively." It would begin to move too far from the language of the claim to impose a further definition.

A.J. also seeks a further construction of "interlock" to mean "lock into position." This again presents the risk of moving too far from the claim language in constructing the claim. The term "engage" does not necessarily suggest that the retainer, tabs, and slots must "lock into position." Moreover, "lock into position" does not offer much of an advantage over "interlock" as a definition of the "engage." To function properly, the invention Rather than drift further away from the language of the claim, the Court constructs engage to mean "interlock."

To sum up, then, the Court finds that the disputed phrase "cooperatively engaging" refers to the tabs of the C-shaped wrench disc, the retainer, and the slots of the tube. The phrase itself is constructed to mean "work together to interlock."

### 3. Construction of "Said Retainer Being Detachably Cooperative with the Tabs to Rotate the Disc and a Tie Rod Engaged Therewith"

The parties also dispute the meaning of the phrase "said retainer being detachably cooperative with the tabs to rotate the disc and a tie rod engaged therewith." Whereas the previous phrase suffered from mere grammatical imprecision, this phrase has been hit by a grammatical tornado. The juxtaposition of "detachably" with "cooperative" creates an apparent

oxymoron for which neither party offers an adequate explanation. Additionally, it is unclear which part or parts of this phrase are "engaged therewith." It could be that the disc is "engaged therewith" the tie rod; or it could be that the disc and the tie rod together are "engaged therewith" the tabs; a third option would be that the disc and the tie rod are "engaged therewith" "said retainer"; a fourth option would be that the disc and tie rod are "engaged therewith" the tabs and "said retainer." Each of these constructions of this language would be plausible using only grammatical rules. For this reason, examination of the plain language of this phrase is unlikely to result in a conclusive claim construction.

The parties do offer proposed constructions of this disputed phrase. Defendant A.J. believes it should be defined to mean: "the retainer separates or disengages the tabs of the c-shaped wrench disc from their locked position, but acts at the same time as the tabs to rotate the disc and a tie rod locked into position therewith." (Def. Br. at 19). Plaintiff Lisle suggests the disputed phrase should be construed to mean: "the retainer separates or disengages from, but works together with, the tabs to rotate the disc and a tie rod that is interlocked with the disc."

Rather than get into the meaning of this disputed phrase, A.J. asserts that the parties' dispute over this claim duplicates the dispute over "cooperatively engaging". Simply because this phrase contains the word "cooperative" and the word "engage" does not render the dispute over the meaning of this phrase coextensive with the dispute over the previous phrase. While it is true that A.J.'s proposed construction is rooted in its proposed construction of "cooperatively engaging," that does not mean that the conclusive construction of "cooperatively engaging" in the prior portion of the claim will be conclusive as to this portion. When the two words combine to form one phrase as an adverb (cooperatively) and verb (engaging), the meaning of the single

11

phrase is likely to be different from the meaning of the words when cast into a different context.

Lisle again proposes to construe this claim according to "its ordinary meaning." (Pl. Br. at 13-14). The proffered ordinary meanings of cooperative and engage are the same as in the previous phrase, that is, "to work together" and "to interlock" respectively. (Pl. Br. at 13). The proffered ordinary meaning of detachable is "separates or disengages from." (Pl. Br. at 12-13).

Lisle's proposed construction tackles the "engaged therewith" portion of the claim, positing that it should be the tie rod that is "engaged therewith" the C-shaped wrench disc. The invention does require that the tie rod and the C-shaped wrench disc engage. Additionally, both the disc and the tie rod would rotate when the invention was operating properly. In light of the nature of the invention, the Court agrees with Lisle that the latter portion of the disputed phrase should be construed to relate only to the disc and the tie rod. This construction also comports with the dictionary definition of "therewith" ("with that")[2], which implies that this somewhat archaic term modifies "that" which immediately preceded it.

Lisle did no better than A.J. at addressing the apparent oxymoron of "detachably cooperative." Both parties urge the same plain meaning of detachable, i.e. "to separate or disengage from." As an adverb, "detachably" must modify the adjective "cooperative", so, if the language and grammar is to be believed, the separation or disengagement must be part and parcel of the cooperation between the retainer and the tabs. While the Court can imagine items that would separate or disengage while they work together (the acorn and the oak, for example), the inner tie rod tool that is the subject of the '776 patent is not among them. In the context of this

---

[2]"therewith *adv.* 1. With that, this, or it. 2. In addition to that. 3. Immediately thereafter." Webster's II New Riverside University Dictionary (1988)

12

patent, where the tabs, slots, and retainer must "work together to interlock," it is unimaginable for the tabs and retainer to be "detachably cooperative."

In light of this enigmatic language, the Court consults the prosecution history for an answer to the riddle. In the prosecution of the patent, Lisle emphasized to the patent examiner in its request to reconsider that the patent "specifies the retainer is <u>detachably cooperative</u> with the tabs." (Pl. Ex. F at LIS 000871) (emphasis in original). This feature was clearly significant to the patentee. It is also clearly separate from the cooperative engagement between the tabs and the retainer, which was described immediately before the "detachably cooperative" feature in the request to reconsider. (Pl. Ex. F at LIS 000870). Although the patent history reveals that this is a salient feature of the invention, it does not provide a definite answer to the construction.

Under Lisle's proposed construction, the conjunction "but" separates the definition of detachable from the definition of cooperative. The effect of this construction would be to sever "detachably" from "cooperative" and interpret both terms separately, i.e. the retainer and the tabs are detachable from each other, and they are also cooperative with each other. A.J.'s proposed construction accomplishes the same results, though its language is slightly different.

While it is true that the retainer and tabs are both detachable and cooperative, the term "detachably cooperative" attempts to capture both concepts at once. Rotation is necessary both for engagement with the tabs and for detachment from the tabs.[3] To engage the tabs, the tabs must be inserted into the slots on the tube, and then rotated into the retainer. To detach the tabs from the retainer, the retainer must be rotated so the tabs are aligned with the slots to permit full

---

[3]If the retainer is a permanent fixture on the hollow tube rather than a separate component part, then the whole tube would be rotated to rotate the retainer, thereby engaging or detaching the tabs.

13

detachment. In order to capture the full meaning of the phrase "detachably cooperative" while remaining true to the claim of the '776 patent, the Court finds that this phrase refers to the rotation of the retainer and the tabs.

Consequently, the disputed phrase "Said retainer being detachably cooperative with the tabs to rotate the disc and a tie rod engaged therewith" is constructed to mean: Rotation of the retainer and the tabs can result in separation or disengagement or it can result in rotation of the disc and a tie rod that is interlocked with the disc.

### 4. Construction of Retainer Includes Slots

The final disputed phrase is "retainer includes slots" in the fourth claim of the '776 patent. Based on the plain meaning of the term "include", A.J. urges this construction: "the slots are a component part of a larger whole, which is the retainer." (Def. Br. at 20.) Lisle, meanwhile, urges the following construction based on the plain meaning of the term "slots": "the retainer includes slits." (Pl. Br. at 14). The fuller passage surrounding the disputed phrase is: "The tool of claim 1 wherein the retainer includes slots for receipt of the tabs." (Pl. Ex. A at Col. 4, lines 34–35).

Retainer has been constructed above, so the only remaining terms in dispute are "includes" and "slots". "Include" will be given its plain and ordinary meaning, which is "being part of a whole." (Def. Br. at 20). "Slots" in the context of the '776 patent refer to opening with which to receive the tabs of the C-shaped wrench disc. They are described thusly in claim 1: "at least two slots for cooperatively engaging the tabs of the wrench disc." (Pl. Ex. A at col. 4, lines 22–24). In claim 1, the tools describe the tube as having slots at the same end as the retainer. In claim 4, the retainer, rather than the tube itself, would contain the slots.

14

The Court finds that the phrase "retainer includes slots" does not need further construction in light of the language that immediately follows. Lest there be any dispute, the fuller phrase," the retainer includes slots therein for receipt of the tabs", is constructed to mean: "the retainer contains slots for receipt of the tabs on the c-shaped wrench disc."

CONCLUSION

For the reasons stated above, the Court construes the disputed terms and phrases in the '776 patent as follows:

The term "retainer" means "any of various devices used for holding something";

The phrase "cooperatively engaging" means "work together to interlock";

The phrase "said retainer being detachably cooperative with the tabs to rotate the disc and a tie rod engaged therewith" means "rotation of the retainer and the tabs can result in separation or disengagement or it can result in rotation of the disc and a tie rod that is interlocked with the disc"

The phrase " retainer includes slots therein for receipt of the tabs" means "the retainer contains slots for receipt of the tabs on the c-shaped wrench disc."

It is so ordered.

**Enter:**

_____
**David H. Coar**
**United States District Judge**

**Dated: June 19, 2003**